UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE CITY CLUB OF NEW YORK, ROBERT BUCHANAN, AND TOM FOX, <br><br>                  Plaintiffs, <br><br>       -against- <br><br> UNITED STATES ARMY CORPS OF ENGINEERS, COL. DAVID A. CALDWELL, in his official capacity as District Engineer of the New York District of the United States Army Corps of Engineers; HUDSON RIVER PARK TRUST, AND PIER55, INC., <br><br>                Defendants. | Civil Action No. _____ <br><br> **COMPLAINT** |

### PRELIMINARY STATEMENT

1.     Everyone knows what the word "basic" means.  Something basic is simple, essential, and distilled to the core.  Food and shelter are a person's basic needs, and a new recruit learns the rudiments of military service in basic training.

2.     In determining whether to issue a permit for a project under the Clean Water Act (CWA), the United States Army Corps of Engineers (USACE) is required by law to first define the project's "basic purpose."  USACE must then define the "overall project purpose," which is somewhat narrower and more specific than the basic purpose.  Next, USACE must determine whether the project is in a "special aquatic site," such as a wetland or a marine sanctuary.  If a proposed project is in a special aquatic site but does not require access to the water—that is, if it is not "water dependent"—then the permit applicant has a heightened burden

to prove that practicable, less environmentally harmful alternatives do not exist. These required steps are set forth in federal regulations.[1]

3.       The Hudson River Park Trust (HRPT) is trying to build a new, seven-story, 2.7-acre island performance venue called Pier 55 along the Manhattan shoreline in a section of the Hudson River protected by state law as an Estuarine Sanctuary. The basic purpose of Pier 55 is the creation of a green space for the performing arts and passive recreation. This purpose can just as easily be fulfilled at a variety of sites on land as it can on a new pier platform over water. It is not water dependent.

4.       USACE, however, defined Pier 55's basic purpose as: "to provide a vegetated pier platform within Hudson River State Park with an amphitheater and public restrooms; and to continue to provide safe public access pier structures within Hudson River State Park." This definition of Pier 55's basic purpose is improper for three reasons.

5.       First, USACE gerrymandered Pier 55's basic purpose in an effort to make it "water dependent." Rather than identify Pier 55's essential functions—to provide performance space and a park—in an intellectually honest manner, USACE included specific architectural features, such as a "vegetated pier platform," in its description of the basic purpose. By defining Pier 55's basic purpose to include a "vegetated pier platform," USACE defined the project in such a way as to exclude alternatives on land from consideration. But a green space for the performing arts and passive recreation can just as easily be built on land as over water.

6.       Second, USACE failed to define Pier 55's basic purpose at a sufficiently "basic" level. Under the law, the basic purpose must be simple, essential, and distilled to the core. The basic purpose of a limestone mine is to extract limestone.[2] According to USACE's

---

[1] *See* 40 C.F.R. §§ 230.10(a), 230.40(a).
[2] *See Sierra Club v. Van Antwerp*, 362 F. App'x 100, 105-07 (11th Cir. 2010).

own Standard Operating Procedures, the basic purpose of any residential development—no matter how fancy, and no matter how close to the water—is "to provide housing for people."[3] Even when a housing development is on a riverfront and includes boat slips, its basic purpose is simply to provide housing.[4] USACE's definition of Pier 55's basic purpose does not capture the project's essential function: hosting performances and passive recreation.

7.      Third, USACE's definition of Pier 55's basic purpose fails to identify a genuine *purpose*. A vegetated pier platform, an amphitheater, public restrooms, and safe public access are *means* to achieve a purpose, not a purpose in themselves. The real purpose of Pier 55 is to enable the performing arts and passive recreation, just as the purpose of a restaurant is to provide a place for customers to dine—not to house a stove, tables, and a safely functioning front door.

8.      Having improperly defined Pier 55's basic purpose, USACE issued a permit modification approving the Pier 55 project and authorizing HRPT to drive metal piles and discharge liquid concrete into the Estuarine Sanctuary. In doing so, USACE failed to hold HRPT to the high standard the law requires. The Estuarine Sanctuary is a special aquatic site, and Pier 55's actual basic purpose is not water dependent. Practicable, less environmentally harmful alternatives are therefore presumed to exist, unless HRPT clearly proves otherwise.[5] HRPT did not meet its burden. Practicable, less harmful alternatives exist. For example, Gansevoort Peninsula, just a few blocks to the south, could accommodate similar facilities without the need to drive more than 500 piles in the Estuarine Sanctuary and cover an additional 2.7 acres of the Hudson. Once New York City relocates the tow pound that currently occupies

---

[3] U.S. Army Corps of Engineers, Dep't of the Army, Memorandum for Commanders, Major Subordinate Commands and District Commands (July 1, 2009).
[4] *See Korteweg v. USACE*, 650 F. Supp. 603 (D. Conn. 1986).
[5] 40 C.F.R. § 230.10(a)(3).

Pier 76 and HRPT gains a possessory interest in the pier,[6] the existing Pier 76 platform could also support comparable facilities.

9.      Defining the project's basic purpose is the first step in USACE's analysis. Everything else flows from it.  An error in answering this threshold question makes the resulting permitting decision arbitrary, capricious, and contrary to law.

10.     Because of this error and others, the permit modification must be vacated.

## JURISDICTION AND VENUE

11.     Plaintiffs bring claims under the laws of the United States, specifically 5 U.S.C. §§ 702 and 706, and subject matter jurisdiction is conferred upon this Court by 28 U.S.C. § 1331.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because a defendant resides in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

13.     Plaintiff The City Club of New York (the "City Club") is a not-for-profit corporation with its offices located at 249 West 34th Street, New York, New York 10001.  It was founded in 1892 to promote effective and honest government in New York City.  Its mission today is to promote thoughtful urban land use policy that responds to the needs of all New Yorkers, including issues directly related to the environment and government practices.  In particular, the City Club has advocated to protect New York City parks from commercial development, most notably in opposing the construction of a mega-shopping mall in Flushing Meadows-Corona Park.

---

[6] *See* N.Y. Unconsol. Law § 1647(9)(c).

14.     Plaintiff Robert Buchanan is a resident of Brooklyn, New York.  He is an educator who taught journalism and environmental studies at Eugene Lang College from 2005 to 2015, and presently works with high school students in a variety of capacities on and off the water.  Mr. Buchanan is an avid boater.  He is a member of the Steering Committee of the New York City Water Trail Association, a group that represents the common interests of human-powered boaters and community boating organizations throughout the New York City harbor. Mr. Buchanan is also a founder and board member of the Village Community Boathouse, where he helps to organize free public and scholastic rowing sessions within the Hudson River Park (the Park).  Mr. Buchanan regularly uses and enjoys the Park to teach rowing, sailing, and boatbuilding.  Depending upon wind and current conditions, Mr. Buchanan uses the site of the Proposed Project as a sheltered area to oversee his students' practice of rowing and sailing techniques.  The construction of Pier 55 would directly affect Mr. Buchanan's personal ability to fully use and enjoy the Park, and would also affect his ability to steward others' use and enjoyment of the Park.  Mr. Buchanan is a member of the City Club.  Plaintiffs incorporate by reference Mr. Buchanan's April 20, 2016 affidavit, annexed as Exhibit A.

15.     Plaintiff Tom Fox is a resident of Queens, New York.  Mr. Fox played an instrumental role in the creation of the Park.  He previously served as one of the drafters of the Hudson River Park Act.  He was the first president of the Hudson River Park Conservancy, the predecessor to HRPT, in which capacity he oversaw the Park's design and financial planning. He was also a founding board member of the Friends of the Hudson River Park.  Mr. Fox has a long history of involvement with the Park and has played a leading role in advocating for its responsible development consistent with its initial plans.  Mr. Fox also regularly engages in recreation in the Park, including visiting historic vessels and enjoying the view from the shore.

Mr. Fox is a member of the City Club.  Plaintiffs incorporate by reference Mr. Fox's April 21, 2016 affidavit, annexed as Exhibit B.

16.     Defendant USACE is an agency of the United States, existing within the Department of the Army, headquartered at 441 G Street NW, Washington, District of Columbia 20314-1000.  USACE issued the permit modification that constitutes the final agency action challenged by Plaintiffs herein.

17.     Defendant Col. David A. Caldwell is the District Engineer of the New York District of USACE, with offices at 26 Federal Plaza, New York, New York 10278.  Col. Caldwell signed the permit modification that constitutes the final agency action challenged by Plaintiffs herein.  Col. Caldwell is sued in his official capacity.

18.     Defendant HRPT is a city-state public benefit corporation with its principal office at Pier 40, New York, New York 10014.

19.     Defendant PIER55, Inc. is a nonstock corporation organized under the laws of Delaware with its principal place of business at 555 West 18th Street, New York, New York, 10011.

## FACTS

### *The Federal Permitting Framework*

20.     Under the Rivers and Harbors Act of 1899, it is unlawful to build a pier in the navigable waters of the United States outside established harbor lines without a USACE permit.[7]  Under the Clean Water Act (CWA), it is unlawful to discharge fill material into the navigable waters of the United States without a USACE permit.[8]  A CWA permit is also required

---

[7] *See* 33 U.S.C. § 403.
[8] *See* 33 U.S.C. § 1344(b).

for any activity that "would have the effect of a discharge of fill material."[9]  For example, when pilings are "so closely spaced that sedimentation rates would be increased," or when the placement of the pilings "would result in the adverse alteration or elimination of aquatic functions," a CWA permit is required for the placement of the pilings themselves.[10]

21.     HRPT sought a permit modification for Pier 55 under both of these statutes.  It sought a CWA permit because its plans for Pier 55 involve pouring liquid concrete fill into hollow metal piles to support the island platform.

22.     In determining whether to issue a CWA permit, USACE must follow its own regulations and regulations promulgated by the Environmental Protection Agency (EPA). Those EPA regulations forbid the discharge of fill into the navigable waters if there is a practicable alternative that would have less adverse environmental impact.  Whether an alternative is practicable is determined in light of the project's overall purposes.[11]

23.     The regulations provide heightened protection for special aquatic sites. Special aquatic sites include sanctuaries designated under state law "to be managed principally for the preservation and use of fish and wildlife resources."[12]  In a special aquatic site, all practicable alternatives are presumed to have less adverse environmental impact.  And practicable alternatives are presumed to exist if the proposed project "does not require access to or proximity to . . . the special aquatic site . . . to fulfill its basic purpose (i.e., is not 'water

---

[9] 33 C.F.R. § 323.3(c)(1).
[10] Id.
[11] See 40 C.F.R. § 230.10(a)(2) ("An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.  If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity may be considered.").
[12] 40 C.F.R. § 230.40(a).

dependent').'' To overcome these presumptions, the applicant must "clearly demonstrate[]" that no practicable, less harmful alternatives exist.[13]

24.     Thus, when deciding whether to authorize a project under the CWA, USACE must first determine the project's basic purpose.  Next, USACE must determine the overall project purpose, which is somewhat narrower and more specific than the basic purpose. Next, USACE must determine whether the project is in a special aquatic site.  USACE must then determine whether there are any practicable, less damaging alternatives to the proposed project. If the project is in a special aquatic site and is not water dependent, then USACE must conclude that practicable, less damaging alternatives exist—and therefore deny the permit—unless the applicant clearly proves otherwise.

### *The Hudson River Park and Pier 54*

25.     In 1998, the New York State Legislature passed the Hudson River Park Act (the Act), which created HRPT and authorized the establishment of the Park.  Recognizing that "the area of the Hudson river within the [Park] is an important habitat for many marine and estuarine species including striped bass," the Act created the Hudson River Park Estuarine Sanctuary.  The Act mandated that HRPT develop a management plan for the Estuarine Sanctuary that provides for conservation, education, public recreation, and other uses.[14]

26.     In 2000, USACE issued Permit NAN-1998-00290 to HRPT for the construction of the entire Park.

27.     Today, the Park spans approximately five miles along the western shore of Manhattan in New York City, from 59th Street down to Battery Park at the island's southern tip.

---

[13] 40 C.F.R. § 230.10(a)(3).
[14] N.Y. Unconsol. Law § 1648.

The Park extends from Manhattan streets out into the Hudson River and consists of the Estuarine Sanctuary, piers, and land areas.

28.     Pier 54, located just south of 13th Street, was built in 1906 for the Cunard Steamship Company.  It has an enduring place in the maritime history of New York City. *Carpathia* docked at Pier 54 when delivering survivors of the *Titanic* disaster to New York, and *Lusitania* departed from Pier 54 on its final voyage.  The iconic iron arch of the White Star Line still stands at the foot of Pier 54.

29.     The original General Plan for the Park provided that Pier 54 would serve as a "public pier" where historic ships would dock, and that Pier 54 would feature arches and granite bases from the original façade of the historic pier.  Pier 54 was already in poor condition and in need of rehabilitation at the time the Park was created.

30.     After the Park's creation, Pier 54 was regularly used for concerts, festivals, art installations, and other performance events rather than historic programming.

31.     Pier 54 continued to deteriorate.  In 2005, HRPT obtained approval from USACE and the New York State Department of Environmental Conservation to completely rebuild Pier 54 as a conventional pier—a flat, rectangular structure extending from shore into the water—in its preexisting location.

32.     According to Madelyn Wils, the President and Chief Executive Officer of HRPT, the 2005 design for the reconstruction of Pier 54 "suffered from several problems."  It had no seating and no greenery, and its narrow width limited performance flexibility.  It had no bathrooms, despite a capacity of 5,000 people.  The approved 2005 design also lay below the future floodplain, meaning that it would provide no flood resilience as sea levels rose.  For these

reasons, according to Ms. Wils, the 2005 design "would not provide the community with the amenities that it needed."

33.     Despite having received the necessary permits to rebuild Pier 54 in 2005, HRPT never did so.  It instead allowed Pier 54 to fall into further disrepair.  HRPT recently removed Pier 54's concrete deck.  Pier 54 now exists only as a pile field.

### *Pier 55*

34.     In 2013, at HRPT's request, the New York State Legislature amended the Act to permit the "reconstruction" of Pier 54, with a somewhat expanded width, "outside of its historic footprint," notwithstanding the otherwise applicable restrictions on construction in the Estuarine Sanctuary.[15]  At this time, unbeknownst to the public, HRPT was negotiating with media mogul Barry Diller about a new Pier 55 project.  HRPT did not disclose its plans for Pier 55 to the Legislature at the time.

35.     On November 16, 2014, HRPT and the Diller-von Furstenberg Family Foundation announced their plans to build Pier 55, a new island that would be located between the existing Pier 54 and Pier 56 pile fields and would be attached to the bulkhead by pedestrian bridges.  Pier 55 would include three performance spaces, including a main performance area that could accommodate up to 5,000 people.  Pier 55 would have an undulating surface, with elevations ranging from eight feet to approximately 62 feet, supported by more than five hundred piles driven into the riverbed.  The project would cost in excess of $130 million, over $100 million of which would be provided by a gift from Mr. Diller and his spouse, Diane von Furstenberg.  PIER55, Inc., a private nonprofit corporation controlled by Mr. Diller, would operate Pier 55 pursuant to a lease.

---

[15] N.Y. Unconsol. Law § 1648(3).

36.     On November 17, 2014, HRPT released an Environmental Assessment Form (EAF) concluding that the Pier 55 project had no possibility of any significant adverse environmental impact, as well as a proposed amendment to the Park's General Plan and a Proposed Lease between HRPT and PIER55, Inc.  HRPT's EAF compared the potential environmental impact of Pier 55 to the potential environmental impact of the "no action" condition, which HRPT asserted was the reconstruction of Pier 54 as a flat, rectangular pier in its preexisting footprint, as approved by USACE in 2005.

37.     The image on the left shows the site as it currently exists.  The image on the right is a rendering of the proposed Pier 55:

 

38.     HRPT used the reconstruction of Pier 54 as a flat, rectangular pier as the "no action" alternative in the EAF despite its own recognition that this design suffered from several major problems and was unsatisfactory.  On April 4, 2016, the Supreme Court of the State of New York, County of New York, found that, in light of the "distinct drawbacks" of the design approved in 2005, HRPT was "highly unlikely" to rebuild Pier 54 in its original form as a flat, rectangular pier.[16]  As a result, the Supreme Court found that HRPT's environmental analysis failed to include a proper "no action" alternative under New York State law.

---

[16] *City Club of New York v. Hudson River Park Trust*, No. 101068/2015 (Sup. Ct. N.Y. Cnty. Apr. 4, 2016).

*USACE's Agency Action*

39.     In February 2015, HRPT applied to USACE for a modification to its existing permit that would authorize the construction of Pier 55.

40.     On October 2, 2015, USACE issued a public notice concerning HRPT's request for authorization to build Pier 55.  The public notice provided for a public comment period that would be open until November 4, 2015.  The deadline to submit public comments was later extended until November 19, 2015.

41.     Plaintiffs submitted comments to USACE on November 19, 2015, which are annexed as Exhibit C and which Plaintiffs incorporate by reference.

42.     On April 25, 2016, USACE issued Permit Modification NAN-1998-00290-M20 authorizing the construction of Pier 55 pursuant to the Rivers and Harbors Act and the CWA, pursuant to various conditions.

43.     Also on April 25, 2016, USACE issued an Environmental Assessment and Statement of Findings (EA/SOF) documenting its conclusions with respect to the Pier 55 project and the permit modification.

**FIRST CAUSE OF ACTION**

**5 U.S.C. § 706(2)(A) – ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW – DEFINITION OF PROJECT PURPOSE AND ANALYSIS OF ALTERNATIVES**

44.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

45.     USACE's authorization of Pier 55 under the CWA is arbitrary, capricious, and contrary to law.

46.     USACE defined the project's basic purpose as "to provide a vegetated pier platform within Hudson River State Park with an amphitheater and public restrooms; and to

continue to provide safe public access pier structures within Hudson River State Park."  This is not a cognizable "basic purpose."  Defining Pier 55's basic purpose in this manner violates 40 C.F.R. § 230.10(a)(3) and USACE's own regulatory guidance.  By itself, this error requires that USACE redo its analysis to comply with the law.

47.   Having erred in defining the basic purpose, USACE erred in concluding that the basic purpose is water dependent.  The basic purpose of Pier 55 is properly defined as the creation of a green space for the performing arts and passive recreation.  This basic purpose is not water dependent.  By including specific architectural and structural features such as "a vegetated pier platform" in the basic purpose, USACE attempted to make the project water dependent by definition and to exclude all alternatives on land from consideration.  Gerrymandering the basic purpose in this fashion also violates 40 C.F.R. § 230.10(a)(3) and USACE's own regulatory guidance.

48.   Having erred in defining the basic purpose, USACE also erred in defining the "overall project purpose" under 40 C.F.R. § 230.10(a)(2).  The overall project purpose is narrower than the basic purpose.  USACE defined Pier 55's overall project purpose as "to reconstruct a deteriorated pier in a nearby location with a different, more environmentally beneficial structure than originally authorized in May 31, 2000, to provide open space parkland to allow for educational opportunities and low-cost entertainment to the public."  This overall project purpose, like the basic purpose, is improperly gerrymandered to this particular site and artificially excludes practicable alternatives.

49.   USACE further erred in concluding that the Estuarine Sanctuary is not a special aquatic site.  The Estuarine Sanctuary is a special aquatic site under 40 C.F.R. § 230.40(a) because it is a designated sanctuary under state law that is "managed principally for

the preservation and use of fish and wildlife resources."  The New York State Legislature has clearly expressed that its purpose in creating the Estuarine Sanctuary was to protect the marine habitat of aquatic species, especially the striped bass.  Construction, commercial uses, and non-water-dependent uses are significantly restricted in the Estuarine Sanctuary, and the Estuarine Sanctuary must be used predominantly for conservation, research, and recreation.[17]  The principal goal of all these restrictions is to preserve fish and wildlife resources.

50.     Pier 55 would be located in a special aquatic site, and its basic purpose is not water dependent.  USACE failed to require HRPT to "clearly demonstrate[]" that no practicable, less environmentally harmful alternatives to Pier 55 exist, as required by 40 C.F.R. § 230.10(a)(3).  Such alternatives do exist.  They include the existing landfill platform at Gansevoort Peninsula a few blocks south, the existing Pier 76 platform, and other potential sites on land.

**SECOND CAUSE OF ACTION**

**5 U.S.C. § 706(2)(A) – ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW – PILES HAVE THE "EFFECT OF FILL"**

51.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

52.     USACE's authorization of Pier 55 under the CWA is arbitrary, capricious, and contrary to law.

53.     USACE issued a CWA permit to HRPT to allow it to discharge liquid concrete fill into hollow metal pilings.  A CWA permit is also required to drive the piles themselves under 33 C.F.R. § 323.3(c)(1) if their placement "would have the effect of a discharge of fill material."  For example, when pilings are "so closely spaced that sedimentation

---

[17] *See* N.Y. Unconsol. Law § 1648.

rates would be increased," or when the placement of the pilings "would result in the adverse alteration or elimination of aquatic functions," the pilings would have the effect of fill, and a CWA permit is required for their placement.

54.     USACE did not issue such a permit here.  It determined that the placement of the pilings supporting Pier 55 would not have the effect of a discharge of fill material.  This determination was arbitrary and capricious.  The pilings are sufficiently dense that they would increase sedimentation; they would effectively replace the bottom of the River; and their placement would adversely affect aquatic functions.

### THIRD CAUSE OF ACTION

### 5 U.S.C. § 706(2)(A) – ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW – IMPROPER CONSIDERATION OF "NO ACTION" ALTERNATIVE

55.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

56.      USACE's authorization of Pier 55 under the Rivers and Harbors Act and the CWA is arbitrary and capricious.

57.     In conducting an environmental analysis, USACE is required to compare the proposed project to a "no action" alternative.  Here, USACE used the reconstruction of Pier 54, as authorized in 2005, as the "no action" alternative.

58.     USACE measured Pier 55's potential environmental impact against the baseline of the "no action" alternative.  For instance, USACE concluded that Pier 55 would not adversely affect fish and wildlife values because it would have a similar impact to the reconstruction of Pier 54 in the "no action" alternative.

59.     In weighing Pier 55's potential *benefits* under 33 C.F.R. § 320.4(a)(1), however, USACE assumed that Pier 54 would *not* be rebuilt as prescribed by the "no action"

alternative.  For instance, USACE explained that Pier 55 would yield economic and cultural

benefits because Pier 54 is currently closed and cannot hold performances.  But Pier 54 would be

rebuilt and would continue to hold performances under the "no action" alternative.

       60.    This inconsistency is arbitrary and capricious.  USACE is not permitted to

use one baseline to minimize Pier 55's expected environmental impact, while using a different

baseline to inflate Pier 55's expected benefit.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1) Issue an order nullifying, vacating, and setting aside Permit Modification No. NAN-1998-00290-M20 issued by USACE on April 25, 2016, and remanding the matter to USACE to re-adjudicate HRPT's application in compliance with applicable law;

2) Enjoin HRPT and PIER55, Inc. from engaging in construction on the Pier 55 unless and until USACE re-adjudicates the application in compliance with applicable law;

3) Award Plaintiffs reasonable costs and attorney's fees under 28 U.S.C. § 2412; and

4) Grant such other and further relief as the Court deems just and proper.

Dated: May 26, 2016
       New York, New York

                                                      EMERY CELLI BRINCKERHOFF
                                                       & ABADY LLP

                                                       Richard D. Emery
                                                       Elizabeth S. Saylor
                                                     Douglas E. Lieb

                                                       600 Fifth Avenue, 10th Floor
                                                       New York, New York 10020
                                                       (212) 763-5000 (t)
                                                       (212) 763-5001 (f)

                                                       remery@ecbalaw.com
                                                       esaylor@ecbalaw.com
                                                       dlieb@ecbalaw.com

                                                       *Attorneys for Plaintiffs*