UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                         :

THE CITY CLUB OF NEW YORK, et al.,     :
                     Plaintiffs,    :
                         :

         -against-            :
                         :

UNITED STATES ARMY CORPS OF      :
ENGINEERS, et al.,                :
                   Defendants.  :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__03/23/2017__

16 Civ. 3934 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, *District Judge*:

       Plaintiffs The City Club of New York, Robert Buchanan and Tom Fox (collectively, "Plaintiffs") move for summary judgment on their claims that Defendant United States Army Corps of Engineers ("USACE" or "Corps") violated the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., by approving a permit modification authorizing the construction of a pier in the Hudson River that would serve as a park and performance space (the "Permit").  Defendants USACE, David A. Caldwell, Hudson River Park Trust ("Trust") and PIER55, INC. (collectively, "Defendants") oppose Plaintiffs' motion and cross-move for summary judgment.  For the following reasons, Plaintiffs' motion is granted and Defendants' motion is denied.

## I.     BACKGROUND

       The following facts are taken from the certified administrative record in this case.

       In 1998, the New York State Legislature passed the Hudson River Park Act, which created the Hudson River Park ("Park"), an approximately five-mile long park along the Hudson River.  *See* N.Y. Unconsol. Law §§ 1646(a)–(c), 1648.  The Park consists of waterfront property, the Hudson River itself, landfill and a number of usable and unusable piers between Battery Park City and 59th Street.  *See id.* § 1643(e).  The Act also designated the area of the Hudson River

within the Park as the Hudson River Park Estuarine Sanctuary ("Estuarine Sanctuary").  *See id.* §
1648(1).  The Estuarine Sanctuary is managed to provide for (1) conservation of the area's
marine resources, (2) "environmental education and research," (3) public recreational use of the
water, (4) authorized commercial maritime uses and (5) other water dependent uses permitted by
the Act.  *Id.* § 1648(2).

Defendant Trust is a public benefit corporation charged with developing and
administering the Park.  *See id.* §§ 1645(1), 1646.  In February 2015, the Trust filed an
application with Defendant USACE seeking permission to pour approximately 411 square feet of
flowable concrete into tubular piles placed in the Hudson River in order to create a new pier near
the site of the now-defunct Pier 54.

The proposed pier, Pier 55, would be an approximately 2.75-acre elevated structure
consisting of green space and performance venues for the purpose of enhancing the public's
enjoyment of the Hudson River.  Pier 55 would provide a replacement for the functions served
by Pier 54, which was the most frequently programmed pier in the Park, and which frequently
hosted movies and concerts for thousands of attendees.  Pier 55 would have three performance
spaces, accommodating several thousand people.  The Trust intends that Pier 55 would provide a
diversity of performance environments and create spaces for both relaxation and cultural events.

After receiving the Trust's request for a permit modification to construct Pier 55, the
Corps published notice of the proposed project and accepted public comments.  Plaintiffs
submitted comments opposing the construction of Pier 55, including a comment urging the Corps
to subject the proposal to greater scrutiny because it would be located in a "special aquatic site."
In response, the Corps stated that the Estuarine Sanctuary is not a special aquatic site within the
meaning of Environmental Protection Agency ("EPA") regulations because it is designed to

serve four park purposes rather than being "managed principally for the preservation and use of fish and wildlife resources."

The Corps also undertook an environmental analysis of the Pier 55 proposal.  In its resulting Environmental Assessment, 404(b)(1) Guidelines Evaluation and Statement of Findings for the Permit ("Statement of Findings"), the Corps provides three statements of purpose for the project.  First, the Corps notes that the Trust's stated purpose for Pier 55 is to "utilize the Hudson River waterfront for the public benefit by reestablishing public access and providing additional public open space resources and cultural space within the Hudson River State Park . . . ." Second, the Corps provides its own definition of the project's basic purpose, which it determines to be "provid[ing] a vegetated pier platform within Hudson River State Park with an amphitheater and public restrooms; and to continue to provide safe public access pier structures within Hudson River State Park."  Third, the Corps defines the project's overall purpose as "reconstruct[ing] a deteriorated pier in a nearby location with a different, more environmentally beneficial structure . . . to provide open space parkland to allow for educational opportunities and low-cost entertainment to the public."

Based on the project's basic purpose, the Corps determined that Pier 55 is water dependent, *i.e.*, "it requires access to or siting in water."  Based on its water dependency determination and the project's overall purpose, the agency evaluated six alternatives to the Trust's proposal.  Each alternative involves the construction of a pier in or near the proposed location of Pier 55.  Ultimately, the Corps determined that these six alternatives were "not practicable based on considerations of cost, existing technology, and logistics in light of overall project purposes."  On April 25, 2016, USACE issued the Permit.  Plaintiffs timely appealed the Corps' decision to this Court.

## II.     STANDARD OF REVIEW

Summary judgment is generally appropriate where the record before the court establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Where, as here, "a court is called upon to review agency action under the [APA], the question presented is a legal one which the district court can resolve on the agency record on a motion for summary judgment." *Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 116 F. Supp. 3d 251, 275–76 (S.D.N.Y. 2015), *aff'd*, 802 F.3d 413 (2d Cir. 2015) (quoting *Univ. Med. Ctr. of S. Nevada v. Shalala,* 173 F.3d 438, 440 n.3 (D.C. Cir. 1999)) (internal quotation marks and ellipses omitted).

"In reviewing the validity of a decision by the Corps to issue a permit under the [CWA], a court should, as provided by the [APA], uphold the decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1032 (2d Cir. 1983) (quoting 5 U.S.C. § 706(2)(A)).  To determine whether an agency has violated this standard, a court considers whether the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 569 (2d Cir. 2015) (citation omitted).  The scope of review under this standard is narrow, and a court may not substitute its judgment for that of the agency.  *See, e.g.*, *Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 802 F.3d 413, 430–31 (2d Cir. 2015).

Although "highly deferential," the APA's standard of review "does not equate to no review." *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013).  The

4

court must be "satisfied from the record that the agency examined the relevant data and articulated a satisfactory explanation for its action." *Nat. Res. Def. Council*, 808 F.3d at 569 (citation and ellipses omitted).  An agency's action is lawful "only if it rests on a consideration of the relevant factors," *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (internal quotation marks omitted), and "reveal[s] a rational connection between the facts found and the choice made." *Brodsky*, 704 F.3d at 119 (citation omitted).  Courts afford an agency's decision "greater deference regarding factual questions involving scientific matters in its area of technical expertise." *Nat. Res. Def. Council*, 808 F.3d at 569; *see also, e.g.*, *Gonzalez v. Oregon*, 546 U.S. 243, 257 (2006) (agency interpretation of regulation not entitled to same level of deference when agency paraphrases statutory language rather than relying upon its own expertise).

## III.   DISCUSSION

Plaintiffs argue that USACE violated the CWA and APA by unlawfully (1) defining the project's basic purpose too narrowly, (2) determining that Pier 55 is a water dependent project, (3) constraining its analysis of project alternatives and (4) determining Pier 55 is in the public interest.  For the reasons explained below, USACE violated the CWA and APA by defining the project's basic purpose too narrowly and by relying upon that unlawful basic purpose to determine that the proposed action is water dependent.  As these failures are dispositive, the remainder of Plaintiffs' claims are not addressed.

### A.   Section 404 Permits Under the Clean Water Act

The CWA "prohibits the discharge of any pollutant, including dredged or fill materials, into the nation's navigable waters, except in compliance with the [CWA's] provisions . . . ." *Bersani v. EPA*, 850 F.2d 36, 39 (2d Cir. 1988); *accord* 33 U.S.C. § 1311(a).  Neither party disputes that the Hudson River is a "navigable water" or that the Trust's Pier 55 proposal would

involve the discharge of dredged or fill materials.

Section 404(a) of the CWA authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged or fill material into navigable waters "after notice and opportunity for public hearings." 33 U.S.C. § 1344(a). In making permitting decisions, the Corps must follow a set of guidelines developed by EPA in conjunction with the Secretary of the Army (the "404(b)(1) Guidelines" or "Guidelines"). *See id.* § 1344(b); *Bersani*, 850 F.2d at 39. These Guidelines prohibit the Corps from granting a Section 404 permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). The Corps' own regulations further require the Corps to conduct a public interest review for each proposed discharge, and prohibit the Corps from granting a permit that (1) would "not comply with [EPA's] 404(b)(1) [G]uidelines" and/or (2) that would be "contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

Under EPA's 404(b)(1) Guidelines, an alternative to the proposed discharge is practicable if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Alternatives need not be in locations that are presently owned by a permit applicant so long as they are otherwise practicable and could "reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity." *Id.*; *accord Bersani*, 850 F.2d at 39.

Whether the project under review would be located within a "special aquatic site" as defined in the Guidelines is a key factor in the Corps' analysis of practicable alternatives. If a proposed project is not located within a special aquatic site, the Corps evaluates the existence of

6

practicable alternatives to the proposal and determines whether the proposal is in the public interest.  *See* 40 C.F.R. § 230.10(a); 33 C.F.R. § 320.4(a)(1).  If the proposal has practicable alternatives that would have less adverse impact on the aquatic ecosystem without other adverse environmental effects and/or is not in the public interest, the Corps may not grant the permit.  *See* 40 C.F.R. § 230.10(a); 33 C.F.R. § 320.4(a)(1).  When undertaking this analysis, the Corps does not presume the existence of practicable alternatives.  *Compare* 40 C.F.R. § 230.10(a) (containing no mention of a presumption), *with* 40 C.F.R. § 230.10(a)(3) (requiring application of presumptions in certain circumstances).

Where a proposed permit would allow discharge into a special aquatic site, the Corps undertakes a two-step analysis to determine what presumption to apply to its analysis of whether to grant the permit.  First, the Corps must properly define the project's "basic purpose" under 40 C.F.R. § 230.10(a)(3).  *See, e.g.*, *Sierra Club v. Van Antwerp*, 362 F. App'x 100, 105–06 (11th Cir. 2010); *Town of Abita Springs v. U.S. Army Corps of Eng'rs*, 153 F. Supp. 3d 894, 919 (E.D. La. 2015).  Second, the Corps must determine whether the "basic purpose" is "water dependent."  *See* 40 C.F.R. § 230.10(a)(3); *Sierra Club*, 362 F. App'x at 106; *Abita Springs*, 153 F. Supp. 3d at 919.  An action is water dependent if it requires access or proximity to, or a location on, water in order to fulfill its basic purpose.  *See* 40 C.F.R. § 230.10(a)(3).  Thus, when a project's basic purpose is to provide boat access to a river, the project is water dependent because it must be located in water to achieve its basic purpose.  *See Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1345–46 (8th Cir. 1994).  In contrast, a proposed gold mine is not water dependent even if the applicant wishes to mine in a watershed because mining gold does not always require access or proximity to water.  *See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008).

If the Corps finds that a proposed project by its general nature is not water dependent, the Corps must presume that practicable alternatives to the project are available in less sensitive areas. *See* 40 C.F.R. § 230.10(a)(3). Likewise, the Corps must presume that such practicable alternatives have less adverse impact on the aquatic ecosystem. *See id.* Once a project is determined to be non-water dependent, the burden shifts to the permit applicant to rebut the first presumption by "clearly demonstrat[ing]" that a practicable alternative is not available, *id.*, and to rebut the second presumption with "detailed, clear, and convincing information *proving* that an alternative with less adverse impact is impracticable." *Sierra Club*, 362 F. App'x at 106 (quoting *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004)). If the basic purpose of a proposed project is water dependent, then these presumptions do not apply.

Thus, if a project is located in a special aquatic site, USACE's determination of the "project's basic purpose and whether it is water dependent are threshold questions that determine the procedure the Corps must follow in granting the applicant a permit." *Id.* If the Corps incorrectly defines the project's basic purpose or improperly determines that the project is water dependent, then it will not follow the procedure set forth by the 404(b)(1) Guidelines, resulting in a decision that is arbitrary and in violation of the APA. *See id.*; *see also, e.g.*, *Nat. Res. Def. Council*, 808 F.3d at 570 (agency action violates APA where agency followed incorrect procedure).

### B.       Applicability of Special Aquatic Site Requirements

The parties disagree about whether the proposed site for Pier 55 is located within a special aquatic site. That issue is critical as it determines whether the Corps must evaluate the proposal's water dependency and ultimately whether the Corps must presume the existence of practicable alternatives to Pier 55. As explained below, the Estuarine Sanctuary is a special

aquatic site within the meaning of 40 C.F.R. § 230.40(a).

The Guidelines provide for six types of special aquatic sites, including, as relevant here, "sanctuaries and refuges."  40 C.F.R. § 230.40(a).  Under the Guidelines, sanctuaries and refuges are "area[s] designated under State and Federal laws or local ordinances to be managed principally for the preservation and use of fish and wildlife resources."  *Id.*

Plaintiffs argue that USACE erred by concluding that Pier 55 would not be located in a special aquatic site when it would be located in the Estuarine Sanctuary, which is a sanctuary designated by New York law to be managed principally for the preservation and use of fish and wildlife resources.  Defendants respond that the Corps reasonably concluded that the Estuarine Sanctuary is not a special aquatic site because it is not managed principally for the preservation and use of fish and wildlife resources but rather is "designed to serve four distinct park purposes: resource protection, public access and recreation, education, and research activities." Defendants' arguments are unpersuasive.

First, the Hudson River Park Act states as its sole purpose in creating the Estuarine Sanctuary the protection of fish and wildlife resources: "The area of the Hudson [R]iver within the Hudson [R]iver [P]ark is an important habitat for many marine and estuarine species including striped bass.  *Therefore*, the water section is hereby designated as the [Estuarine Sanctuary] . . . ."  N.Y. Unconsol. Law § 1648(1) (emphasis added).

Where the intent of the legislature is clear, courts must construe statutes to reflect that intent.  *See, e.g.*, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear [legislative] intent."); *Hill v. Delaware N. Cos. Sportservice, Inc.*, 838 F.3d 281, 288 (2d Cir. 2016) ("In this initial inquiry, we seek not

a broad or narrow statutory construction, but the one that most accurately reflects congressional intent."). In this case, the New York State Legislature clearly stated that its intent in creating the Estuarine Sanctuary was to protect fish and wildlife resources, without expressing any additional purpose. It therefore was counter to the legislative intent for the Corps to find that the Estuarine Sanctuary was not principally created for resource protection, even though the Hudson River Park Act also permits other uses of the sanctuary.

Second, in accordance with its stated reason for creating the sanctuary, the Hudson River Park Act requires the Trust to manage the Estuarine Sanctuary for reasons the majority of which relate to the preservation and use of fish and wildlife resources -- to provide for (1) "conservation of the marine resources found in the area, with special consideration for habitat values," (2) "environmental education and research," (3) "public recreational use of the water section, including boating, fishing and swimming," (4) authorized commercial maritime uses in the portions of the river "adjacent to park/commercial uses" and (5) other water dependent uses permitted in the river by the Act. N.Y. Unconsol. Law § 1648(2). Conserving marine resources indisputably fits within the ambit of preservation and use. Likewise, environmental education and research in the sanctuary is directly related to the preservation and use of the marine ecosystem. *See* N.Y. Envtl. Conserv. Law § 11-0306(5) (Estuarine Sanctuary to be managed as "long-term estuarine field laboratory for research and education concerning the Hudson River ecosystem").[1] Public recreational use of the waters also includes the use of fish and wildlife resources as the statute permits fishing.

---

[1] Contrary to Defendants' assertions, Plaintiffs did mention this statute in their administrative comments. Moreover, this statute is incorporated into the Hudson River Park Act, which is the crux of this dispute.

The fact that the Estuarine Sanctuary is not managed exclusively for the preservation and use of fish and wildlife resources does not mean that it is not managed *principally* for those reasons.  The management plan for the Estuarine Sanctuary requires that all permitted uses must be compatible with preserving and protecting the sanctuary's resources.  *See* The Hudson River Park Trust, *Hudson River Park Estuarine Sanctuary Management Plan* 1-1 (Sept. 2002).[2]  The fact that all other uses must be compatible with resource preservation further confirms that the primary goal of the Estuarine Sanctuary is protection of the area's marine resources.

Third, removing multi-use wildlife refuges and marine sanctuaries from the special protections contemplated by the Guidelines and the CWA, as Defendants argue, also would be contrary to the broad protective purpose of the Guidelines and the CWA.  *See* 40 C.F.R. § 230.1(a) ("The purpose of these Guidelines is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material."); 33 U.S.C. § 1251(a) ("The objective of this chapter is to restore and maintain . . . the integrity of the Nation's waters.").

Finally, Defendants' argument that multi-use sanctuaries and refuges are not special aquatic sites is obviously incorrect when applied beyond this case.  Defendants' interpretation of the regulation would mean that even federally-created sanctuaries and refuges within the National Wildlife Refuge System and National Marine Sanctuary System are not special aquatic sites.  The federal laws creating these systems authorize significant additional uses of both those areas.  *See* 16 U.S.C. §§ 668dd(a)(3), (d), 1431(b).  The National Wildlife Refuge System Administration Act provides that "compatible wildlife-dependent recreation is a legitimate and

---

[2] The Hudson River Park Estuarine Sanctuary Management Plan is available online at https://www.hudsonriverpark.org/assets/content/general/EstuarineSanctuaryManagementPlan2002.pdf.

appropriate general public use of the System," and authorizes the Secretary of the Interior to "permit the *use of any area* within the System *for any purpose* . . . whenever he determines that such uses are compatible with the major purposes for which such areas were established."  16 U.S.C. § 668dd(a)(3)(B), 668dd(d)(1) (emphasis added), 668ee(12).   The National Marine Sanctuaries Act provides for enhancing "public awareness, understanding, appreciation, and wise and sustainable use of the marine environment," "support[ing], promot[ing], and coordinat[ing] scientific research on" the marine sanctuaries and facilitating "*all public and private uses of the resources of these marine areas*" that are compatible with the sanctuaries' primary objectives and not otherwise prohibited by law.  16 U.S.C. § 1431(b)(4)–(6) (emphasis added).  Refusing to recognize any of these sanctuaries and refuges as "special aquatic sites," as Defendants' argument would dictate, leads to an absurd result that illustrates the fallacy of the argument.[3]

        In light of the plain meaning of the regulation and the unreasonableness of the Corps' application of the regulation, the Corps' determination that the Estuarine Sanctuary is not a special aquatic site is contrary to law in violation of the APA.

        Defendants do not argue that the text of the regulation is ambiguous, nor do they argue that the Corps' interpretation of the Guidelines is entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  Consequently, the Court

---

[3] The additional uses permitted in the national wildlife refuges and marine sanctuaries provide further support for the conclusion that the Estuarine Sanctuary is principally managed for the preservation and use of fish and wildlife resources, as they are similar to the additional uses permitted in the Estuarine Sanctuary.  Each statute provides for the preservation of ecological resources and permits compatible uses, including education, research and recreation.  *See* 16 U.S.C. § 668dd(a)(3), (d), 1431(b); N.Y. Unconsol. Law § 1648(2).  Just as these uses do not alter the principal purposes of the National Wildlife Refuge System and the National Marine Sanctuary System, which are undoubtedly to protect fish, wildlife and their habitats, the multiple uses permitted by the Hudson River Park Act do not change the principal purpose of the Estuarine Sanctuary, which is to protect aquatic species and habitat.

does not grant the Corps deference under either case.  *See, e.g.*, *Schneidelman v. C.I.R.*, 682 F.3d 189, 197 n.6 (2d Cir. 2012) ("Although one could argue that the IRS's interpretation of its own regulations may be entitled to some deference under *Auer* . . . , the Commissioner failed to argue for such deference and we deem the argument forfeited."); *Mass. Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1369 (Fed. Cir. 2015) (Circuit court "will not excuse the government's failure to raise" *Auer* deference argument before trial court).

In any event, the Corps is not entitled to either *Auer* deference or *Skidmore* deference for three independent reasons.  First, the language of the regulation is not ambiguous.  *See Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 53 (2d Cir. 2016) ("*Auer* deference is warranted only when the language of the regulation is ambiguous.") (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000)); *Catskill Mountains Ch. of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 509 (2d Cir. 2017) (*Skidmore* deference only applicable if interpreted language is ambiguous).

Second, the Corps was not interpreting its own regulation.  *Auer* deference applies only "when an agency interprets its own regulation."  *See Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) (citation omitted); *see also Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs,* 746 F.3d 698, 708 n.3 (6th Cir. 2014) ("*Auer* deference applies only to disputes over the meaning of an agency's own regulation.").  Here, the regulation that the Corps purports to interpret was drafted by EPA acting "in conjunction" with the Corps.  *See* 40 C.F.R. § 230.2(a); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1050 (2d Cir. 1985) ("EPA promulgated the 404(b)(1) Guidelines that are set forth in 40 C.F.R. Part 230.").  The Corps has its own CWA regulations that are not at issue here, *see* 33 C.F.R. § 320 et seq., and in those regulations, the Corps expressly refers to the Guidelines as "*the Environmental Protection*

13

*Agency's* 404(b)(1) guidelines." 33 C.F.R. § 320.4(a)(1) (emphasis added). USACE is not entitled to *Auer* deference for its interpretation of a regulation it did not draft. *See Martin v. OSHRC,* 499 U.S. 144, 157–58 (1991) (Occupational Safety and Health Review Commission not entitled to deference in interpreting the Secretary of Labor's Regulations).

Third, an agency is entitled to *Skidmore* deference only to the extent that the agency's interpretation has the "power to persuade." *See Catskill Mountains Ch. of Trout Unlimited*, 846 F.3d at 509 (quoting *Skidmore*, 323 U.S. at 140). As explained above, USACE's interpretation of the regulation is not persuasive.

For the foregoing reasons, the Estuarine Sanctuary is a special aquatic site within the meaning of 40 C.F.R. § 230.40(a). As a result, USACE is required to apply the presumption-shifting framework set forth in 40 C.F.R. § 230.10(a)(3) in evaluating the Permit.

### C.     Project Purpose and Practicable Alternatives

In evaluating a project proposal that would require discharge into a special aquatic site, the Corps begins by determining the project's "basic purpose." 40 C.F.R. § 230.10(a)(3); *see also, e.g.*, *Sierra Club*, 362 F. App'x at 105–06. According to the Corps' Statement of Findings, the basic purpose of a project is "the fundamental, essential or irreducible purpose of the proposed project, used to determine whether the permittee's project is water dependent." In determining a project's basic purpose, "courts routinely analyze only the broad purpose of the proposal." *Schmidt v. U.S. Army Corps of Eng'rs*, No. 08 Civ. 0076, 2009 WL 579412, at *12 (W.D. Mich. 2009); *see also Abita Springs*, 153 F. Supp. 3d at 919 (a project's basic purpose is described in "broad and simple terms"). Thus, where an applicant proposes to build a waterfront restaurant, the project's basic purpose is simply to feed people. *See* Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 45 Fed. Reg. 85,336, 85,339 (Dec. 24, 1980).

Likewise, the basic purpose of a limestone mine is mining limestone, regardless of the applicant's preferred mining location.  *See Sierra Club*, 362 F. App'x at 106–07.

Because the Corps' ultimate determination of practicable alternatives relies upon its determination of the basic project purpose, as outlined above, the Corps cannot define the project's basic purpose so narrowly as to make its water dependency determination a foregone conclusion.  *See, e.g.*, *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) ("Obviously, an applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable."); *Gulf Coast Rod, Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 16-40181, 2017 WL 243340, at *3 (5th Cir. Jan. 19, 2017) ("The purposes for the project must not be so narrow that they foreclose the consideration of reasonable alternatives."); *Schmidt*, 2009 WL 579412, at *14 (applicant defined proposed project too narrowly where "[h]is specific need for the exact view provided by the subject property results in an elimination of all practicable alternatives").  *Cf, e.g.*, *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 667 (7th Cir. 1997) (under National Environmental Policy Act, agency may not define project's purpose and need so narrowly as to foreclose all but one possible outcome).

Here, the Corps defined the project's basic purpose so narrowly as to mandate that the Corps also find the project to be water dependent.  The Corps defined the basic purpose as "provid[ing] a vegetated pier platform within Hudson River State Park with an amphitheater and public restrooms; and to continue to provide safe public access pier structures within Hudson River State Park."  This detailed, overly specific definition is a far cry from the "fundamental, essential or irreducible purpose" of the proposed project.  It also unlawfully attempts to compel the Corps' later determination that the project is water dependent by siting the park and

performance space within a pier.

Had the Corps properly defined the project's basic purpose, it almost certainly would have found that the proposal is not water dependent.  The administrative record consistently states that the primary goals of the proposed project are to provide additional public park and performance space.  The Trust's own stated purpose for the proposed project does not mention construction of a pier, but rather the need to provide additional open space resources and cultural space within the Park.  A project whose fundamental goal is to provide park and performance space is not water dependent, regardless of whether the Trust prefers to build such space on a pier.  *Compare, e.g.*, *Slagle v. United States*, 809 F. Supp. 704, 713 (D. Minn. 1992) (development of shoreline lots for residential housing is not water dependent), *and Korteweg v. Corps of Eng'rs of U.S. Army*, 650 F. Supp. 603, 605 (D. Conn. 1986) (construction of residential units on waterfront property not water dependent), *and La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1047 (5th Cir. 1985) (soybean production not water dependent), *and Shoreline Assocs. v. Marsh*, 555 F. Supp. 169 (D. Md. 1983) (boat storage and launch facilities at proposed waterfront townhouse community were incidental to "primary aspect" of project, which was "the construction of a townhouse community"), *with Whistler*, 27 F.3d at 1345–46 (project whose basic purpose is providing boat access to river is water dependent).

Because the Corps improperly determined that the project is water dependent, it failed to apply the required presumptions regarding the availability and environmental effects of practicable alternatives in this case.  *See* 40 C.F.R. § 230.10(a)(3).  Consequently, the Corps' decision to grant the Permit is contrary to law in violation of the APA.  *See Sierra Club*, 362 F. App'x at 106–07; *see also Nat. Res. Def. Council*, 808 F.3d at 570 (finding that EPA acted arbitrarily and capriciously when it applied the wrong standard to its analysis).

16

Defendants argue that the Corps acted within its discretion in determining the project's basic purpose because it permissibly considered the Trust's mission and goals in undertaking the project.  This argument misunderstands the difference between a project's basic purpose and its overall purpose.  A project's basic purpose is meant solely to help the agency determine whether a project is water dependent, and it therefore must be determined in reference to the project's goals in their broadest sense.  *See* 40 C.F.R. § 230.10(a)(3); *Sierra Club*, 362 F. App'x at 106–07; *Abita Springs*, 153 F. Supp. 3d at 919.

By contrast, once the basic purpose and water dependency are determined and the Corps knows whether it must presume the availability of practicable alternatives, the Corps then evaluates practicable alternatives in light of the "overall project purposes."  40 C.F.R. § 230.10(a)(2).  The overall project purpose "is more particularized to the applicant's project than is the basic purpose, and reflects the various objectives the applicant is trying to achieve."  *Fla. Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1243 (M.D. Fla. 2008); *accord Abita Springs*, 153 F. Supp. 3d at 920.  At that point, the Corps may consider the applicant's needs in terms of "desired geographic area of the development" and the "type of project being proposed."  *Fla. Clean Water Network*, 587 F. Supp. 2d at 1244 (citation omitted); *see also Sylvester*, 882 F.2d at 409.

Thus, while it is proper for the Corps to consider the Trust's purpose and geographic mandate of managing the Park, such analysis should take place only after the Corps has determined the project's basic purpose and has moved on to an evaluation of alternatives pursuant to the project's overall purpose.  *See, e.g.*, *City of Shoreacres v. Waterworth*, 420 F.3d 440, 448–49 (5th Cir. 2005) (finding that alternative of building terminal outside of specific geographic location would not comport with applicant's overall project purpose, which was to

promote growth in that location); *Abita Springs*, 153 F. Supp. 3d at 920–21 ("The specific location of the project may be an important aspect of fulfilling the overall project purpose; therefore, location can limit what alternatives are considered practicable.").

 The fact that the Corps may eventually consider an applicant's goals does not permit the Corps do so prematurely.  Indeed, the Guidelines themselves contemplate the consideration of practicable alternatives that are located in areas not presently owned by an applicant if they "could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity."  40 C.F.R. § 230.10(a)(2).  The fact that the Trust is tasked with managing a specific location and would like to build a pier in that location does not compel a finding that the project's basic purpose had to be the construction of a pier within the Park.  *See Sierra Club*, 772 F.2d at 1053 ("No court should allow the use of semantics to succeed in an attempt at glossing over an environmental violation.").

 Defendants' federalism argument is equally meritless.  The fact that the Trust was created by the New York State Legislature and tasked with carrying out a specific mission does not compel a finding that the Corps may abrogate its responsibilities under the CWA to ensure that the proper presumptions are applied and proper alternatives are analyzed.

 Thus, because the Corps incorrectly defined the project's basic purpose, and therefore employed the incorrect procedure in deciding to issue the Permit, the Corps' decision to grant the Permit violated the CWA and is not in accordance with law.

### D. Vacatur

 In the event of a finding that the Permit was improperly granted, Defendants urge the Court to remand without vacatur.  Ordinarily, "when an agency violates its obligations under the APA," the proper course of action is to "vacate a judgment and remand to the agency to conduct

18

further proceedings." *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014).  This rule "is not absolute," and may be deviated from "in rare circumstances."  *Id.* (citation omitted).  Where a court remands an agency action for further proceedings, the determination of whether to vacate the action is within the court's discretion.  *See Nat. Res. Def. Council v. EPA*, 676 F. Supp. 2d 307, 312 (S.D.N.Y. 2009); *Nat. Res. Def. Council*, 808 F.3d at 584 (affirming discretion of reviewing court to shape equitable remedy even when remanding decision to agency).

Though the Second Circuit has indicated that a court may decline to vacate an agency action in limited circumstances, it has not articulated a test for deciding what those circumstances are.  Both parties rely upon the test promulgated by the D.C. Circuit, which provides that the decision to vacate depends on two factors: "the seriousness of the order's deficiencies and the likely disruptive consequences of vacatur."  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (internal quotation marks omitted).

Defendants summarily assert that vacatur is premature and that the Court lacks any record on the costs of vacating the Permit, which they contend will be significant.  Nothing in Defendants' briefing suggests that this is one of the "rare" circumstances in which a court should deviate from the general rule that vacatur is the appropriate remedy when "an agency violates its obligations under the APA."  *Guertin*, 743 F.3d at 388.  Accordingly, vacatur is appropriate here.

IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED.  Plaintiffs' motion for a preliminary injunction is DENIED as moot.  The Permit is vacated and remanded to the Corps for proceedings consistent with this Opinion.

The Clerk of Court is respectfully directed to close the motions at Docket Nos. 21, 48 and 50 and to close this case.

Dated: March 23, 2017
        New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**